OPINION
{¶ 1} Defendant-appellant, Kylon M. Jones, appeals from the November 19, 2002 judgment entry of the Franklin County Court of Common Pleas finding him guilty of complicity to commit murder with firearm specification, tampering with evidence, and having a weapon while under disability, and sentencing appellant to an aggregate term of 26 years to life incarceration. For the reasons that follow, we affirm the decision of the trial court.
{¶ 2} On May 25, 2001, appellant was indicted on (1) complicity to commit aggravated murder with firearm specifications; (2) complicity to commit murder with firearm specifications; (3) complicity to commit felonious assault with firearm specifications; (4) tampering with evidence; and (5) having a weapon while under disability. Appellant's jury trial began on October 15, 2002, whereby, appellant did not testify in his own defense. The following facts were elicited from testimony at appellant's trial.
{¶ 3} On May 11, 2001, appellant, along with Marlon Crowley, Heather Medlin, Sequoia Byrd, and Angela Hughes were riding in Medlin's red/maroon Ford Explorer ("SUV") near The Ohio State University campus ("OSU"). According to Crowley's testimony, he and appellant had been "walking around, chilling, basically, hanging out" earlier in the day drinking and smoking marijuana. (Vol. IV, Tr. 700.) Later that day, appellant and Crowley met up with Medlin, Byrd, and Hughes. Medlin drove the group to Oldfield's, a nearby OSU campus bar, where they had a few drinks and stayed no more than 30 minutes. After leaving the bar, Medlin drove to Taco Bell on North High Street to get some food. According to Byrd, Medlin was too drunk to drive, so appellant drove Medlin's SUV when it came time to leave Taco Bell. (Vol. II, Tr. 226.)
{¶ 4} After leaving Taco Bell, appellant drove north up High Street and turned east onto 11th Avenue. As appellant turned onto 11th Avenue, he swerved the vehicle at a group of people. Hughes, Byrd, and Crowley testified that someone spit into the car. (Vol. II, Tr. 227, 314, 711.) Byrd stated, "* * * the dude, Ryan, I think his name is, he, I don't know, even think it was him, spit. Dude spit in the car * * * [s]o we turned back around." (Vol. II, Tr. 227.) Byrd further explained that " * * * there was some people in the street * * * we swerved over * * * I guess he thought that we would hit him or something or they spit or threw something." (Tr. 228.)
{¶ 5} Hughes explained that everyone in the SUV became mad. Crowley testified that he saw who spit into the SUV. (Vol. II, Tr. 712.) According to Hughes, Crowley instructed appellant to turn around and appellant stated, " * * * that boy's dead, he's dead, he's dead." (Vol. II, Tr. 378.) Appellant drove around the block and came back up 11th Avenue. Byrd testified that appellant slowed the vehicle down and Crowley pulled out a gun and shot Ryan Morbitzer. Byrd and Hughes testified that there was no discussion among the group about shooting anyone. At the time the spitting incident occurred, both Byrd and Hughes thought they were just going back to confront and fight the person who spit in the SUV. (Vol. II, Tr. 228, 315.) Furthermore, when questioned, neither Byrd nor Hughes was aware that Crowley, or anyone else in the SUV, possessed a firearm. (Vol. II, Tr. 230, 321.)
{¶ 6} Melissa Lilburn, an OSU student, was sitting outside of her apartment's front porch on the morning of May 11th. Lilburn testified that she saw a red SUV driving down 11th Avenue and slowed as it approached a person walking on the sidewalk on the opposite side of the street to where her apartment was located. (Vol. I, Tr. 157.) Lilburn testified that she next heard two gunshots and the SUV sped off. At that point, she saw Morbitzer step out onto 11th Avenue and yelled that he had been shot. (Vol. I, Tr. 158.)
{¶ 7} Byrd testified that appellant drove off and that everyone in the SUV was in a panic. Appellant drove to an unknown person's apartment and parked in an alley behind the apartment building. According to Hughes, appellant then asked Crowley if Crowley was certain that he shot the right person.
{¶ 8} On May 12, 2001, appellant was apprehended and questioned by Detective Roger Jacobs of the Columbus Police Department, Assault Squad. According to Detective Jacobs, his interview with appellant was cut short because during his questioning of appellant, Morbitzer died, thereby requiring that the matter be turned over to the homicide unit. (Vol. IV, Tr. 559.) An arrest warrant was later issued for appellant and, on the morning of May 17, 2001, appellant was arrested at a Red Roof Inn.
{¶ 9} On October 30, 2002, the jury returned guilty verdicts on the complicity to commit murder with firearm specification and tampering with evidence counts of the indictment. Prior to trial, at the request of the state, the trial court nolled the complicity to commit felonious assault. (Vol. I, Tr. 19.) Also, prior to trial, appellant waived a jury trial as to the having a weapon while under disability count. (Vol. I, Tr. 8.) This count was tried before the trial court, which found appellant guilty. The jury was unable to reach a unanimous verdict on the counts of aggravated murder with firearm specification and complicity to commit aggravated murder with firearm specification. Upon recommendation of the state, the trial court entered a nolle prosequi as to the counts of aggravated murder with firearm specification and complicity to commit aggravated murder with firearm specification. Appellant was sentenced to an aggregate term of 26 years to life incarceration. It is from the trial court's November 19, 2002 judgment entry that appellant appeals, assigning the following four assignments of error:
 Assignment of Error No. 1
The trial court erred when instructing the jury on the elements of the offense of complicity.
 Assignment of Error No. 2
The trial court erred in depriving appellant of his right to testify in his own behalf.
 Assignment of Error No. 3
The trial court erred by permitting jurors to submit questions to witnesses following initial direct and cross examination by counsel.
 Assignment of Error No. 4
Conviction for complicity to commit murder and tampering with evidence, were against the manifest weight of the evidence or, in the alternative, if appellant's conviction for complicity is reversed based upon the issue raise in assignment of error No. 1, the tampering with evidence conviction should also be reversed[.]
{¶ 10} In his first assignment of error, appellant contends that the trial court committed reversible error in instructing the jury on the elements of the offense of complicity. Specifically, appellant argues that there was neither direct nor circumstantial evidence to prove that he intended to cause the death of Morbitzer, mainly because appellant was unaware that Crowley was armed and that appellant did not have the same culpable mental state as Crowley in causing the death of Morbitzer. The state contends that the fact appellant aided Crowley by driving away after Crowley shot Morbitzer is sufficient to sustain appellant's conviction for complicity.
{¶ 11} On the law of complicity, R.C. 2923.03 states in part:
(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
(1) Solicit or procure another to commit the offense;
(2) Aid or abet another in committing the offense;
(3) Conspire with another to commit the offense in violation of section2923.01 of the Revised Code;
(4) Cause an innocent or irresponsible person to commit the offense.
(B) It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender.
(C) No person shall be convicted of complicity under this section unless an offense is actually committed, but a person may be convicted of complicity in an attempt to commit an offense in violation of section2923.02 of the Revised Code.
{¶ 12} In this case, the trial court instructed the jury as follows:
Complicity. The defendant may be convicted as aider and abettor as a complicitor in the offense charged. Aider or abettor and/or a complicitor is one who aids, assists or encourages another to commit a crime, and participates in the commission of the offense by some act, word or gesture.
I have gone ahead here and separately defined aiding and abetting. That means again, supported, assisted, encouraged, cooperated with, advised or incited.
Solicit means to seek, to act, to influence, to invite, to attempt to lead on, to bring pressure to bear. Procure means to get, obtain, induce, bring about, motivate.
(Vol. VI, Tr. 1075-1076.)
{¶ 13} A review of the record reveals that appellant did not object to the reading of the trial court's instruction on complicity. Crim.R. 30 provides that "[o]n appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. * * * " Absent plain error, the failure to object to improprieties in jury instructions, as required by Crim.R. 30, is a waiver of the issue on appeal. State v. Underwood (1983), 3 Ohio St.3d 12; State v. Williams (1977), 51 Ohio St.2d 112; Crim.R. 30(A) and 52(B).
{¶ 14} In this instance, we find that the jury instructions were not erroneous. However, it appears, after reading appellant's brief that he is not objecting to the jury instruction, but rather to the sufficiency of the evidence for the offense of complicity. At the close of the state's case and at the conclusion of all the evidence, appellant moved for an acquittal of the complicity charge pursuant to Crim.R. 29. In each instance, the trial court found that the evidence was sufficient to send to the jury, thereby denying appellant's motion. We reserve discussion of the sufficiency of the evidence for when we address appellant's fourth assignment of error.
{¶ 15} Additionally, in his first assignment of error, appellant further argues that the trial court's responses to the jury's questions deprived appellant of his right to a fair and impartial trial. During jury deliberations, the jury notified the trial court that they were at a standstill on the complicity to commit aggravated murder and complicity to commit murder charges. The trial court ordered additional arguments from counsel. Appellant's counsel objected. (Vol. VI, Tr. 1124, 1126.) After additional closing arguments, the jury submitted two questions to the court. The first question read:
* * * We would like to know if the state's comments pertaining to the law can be taken as accurate by the jury, colon, for example, if a defendant did purposely solicit or procure another and/or did aid or abet another before, and the word before is underlined, or during, that's underlined, or after, and that's underlined, the crime. Is this before, during or after wording accurate.
(Vol. VI, Tr. 1148.)
{¶ 16} The trial court answered the question, writing: "[s]tatements made by the prosecutor and the defense counsel cannot be considered by you as evidence." (Tr. 1148.) The trial court's answer to the jury's question was correct. See State v. Maurer (1984),15 Ohio St.3d 239 (closing arguments are not evidence in a case). Furthermore, juries are presumed to follow those given instructions when delivering a verdict. Pang v. Minch (1990), 53 Ohio St.3d 186, 195.
{¶ 17} The second question read: "whether the law allows a finding that a person can aid or abet either before, or during, or after the event." (Tr. 1148-1149.) The trial court responded, "yes." (Tr. 1149.) Appellant's counsel objected to the trial court's answer alleging that the state misstated the law. Appellant contends that in complicity to commit aggravated murder and murder, appellant must have had the specific intent to cause the death of Morbitzer. Appellant argues that the trial court's answer to the second jury question led the jury to believe that it did not matter if appellant knew that Crowley had a firearm prior to shooting Morbitzer or that appellant had a specific intent to cause the death of Morbitzer.
{¶ 18} The trial court's response to the jury's question was the correct statement of the law. See State v. Moody (Mar. 13, 2001), Franklin App. No. 98AP-1371 (under a theory of aiding and abetting, the jury could have inferred criminal intent to assist in killing the victim and causing serious harm from appellant's conduct before, during, and after the shooting); State v. Ranson, Franklin App. No. 01AP-1049, 2002-Ohio-2398, at ¶ 32 (appellant encouraged the crimes by his conduct, and his criminal intent may be inferred from his presence, companionship, and conduct both before and after the crime); State v. Widner (1982), 69 Ohio St.2d 267 (complicity to commit attempted murder conviction upheld where the passenger pointed and fired the gun and the driver failed to terminate the flight, but with full knowledge that a firearm was being discharged by the passenger, continued to drive away); State v. Pruett (1971), 28 Ohio App.2d 29, 34 ("[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed"). As such, appellant's first assignment of error lacks merit and is not well-taken.
{¶ 19} In his second assignment of error, appellant argues that the trial court deprived him of the right to testify in his own defense "unless he was made to look like a wild, uncontrollable animal." (Appellant's brief, 13.) Appellant contends that he gave up his right to testify to avoid potential prejudice because the trial court placed too many restrictions on him being able to testify.
{¶ 20} A review of the record reveals that during his trial, appellant was observed throwing gang signs to individuals in the courtroom, talking to the victim's parents, making attempts to tamper with Crowley's testimony, shouting expletives during the playing of a portion of Crowley's confession tape, cursing at his counsel, spitting on the left side of his counsel's face, and raising his hand in an attempt to hit his counsel. On several occasions, the trial court stressed to appellant that the goal is to conduct a fair trial and cautioned appellant to not do anything to unfairly influence the jury. After appellant assaulted his counsel, the trial court discussed with appellant's counsel and counsel for the state possible restraints to be placed on appellant. The trial court ordered appellant handcuffed and chained at the waist, along with wearing legs chains. (Vol. VI, Tr. 990.) The trial court also ordered that appellant be bound, gagged, and ordered to wear a spit shield, and that if appellant had to testify, he would remain bound wearing the spit shield. (Vol. VI, Tr. 990, 991.)[1] The trial court noted that appellant would spend the rest of the trial in the jail cell with the door ajar. The trial court noted, " * * * the actions of the defendant have been and are an attempt to manipulate the trial." (Vol. VI, Tr. 993.)
{¶ 21} When the trial court asked appellant if he wanted to testify, appellant stated, "I will be strapped down. I want to go on the stand. But at this time * * * I'm refusing to testify because I think * * * it would be prejudicial to see all of that stuff in front of the jury." (Vol. VI, Tr. 997.) "So, at this time, just to make the court of appeals be aware, I am not going to testify." (Vol. VI, Tr. 998.) The state noted that the walls on the side of the witness box came almost up to appellant's shoulder. Therefore, appellant could wear a belly chain underneath his suit and be chained to the witness chair without the jury being aware of the restraints. Furthermore, appellant would already be in the witness box when the jury entered the room.
{¶ 22} Counsel for appellant argued that it is customary for everyone to stand when the jury enters the courtroom. If appellant were chained to the witness chair, he would be unable to rise, thereby potentially creating a prejudicial effect. The trial court told appellant that he could wear his suit, be restrained, and already be sitting in the witness box when the jury entered the courtroom. The trial court agreed with the state stating that the jury would not be able to see appellant's restraints. Appellant responded, "There is no actual, you know, certainty that these people can't see the restraints on me. So that will be some inference to the jury, I have been standing the whole trial. [Tr. 1003.] So, therefore, I'm not going to have a fair trial; is that what you are saying? * * * [Tr. 1003.] I, at this time, no. I feel I'm restrained. I think it would be prejudicial to the jury to see me in restraints, me not standing, so forth, to me that I'm going to be denied to testify at this time for that reason." (Tr. 1004.)
{¶ 23} In this instance, we are unable to conclude that the trial court deprived appellant of his right to testify. Appellant argued that he had no choice but to refuse to testify due to the surrounding circumstance that would prejudice his case. Appellant has a constitutional right to refuse to testify. Appellant invoked those rights in this case. We are unable to determine that the trial court deprived appellant of his right to testify. The trial court, on more than one occasion, asked appellant if he was going to testify. (Vol. VI, Tr. 998, 1004.) In each instance, appellant told the trial court that he was not going to testify.
{¶ 24} Furthermore, the trial court's decision to restrain appellant did not deprive appellant of his right to testify. The presence of restraints tends to erode the presumption of innocence that our system attaches to every defendant. State v. Carter (1977), 53 Ohio App.2d 125,131. The decision as to whether to shackle a criminal defendant during the trial lies in the sound discretion of the trial court, and the record should reflect factors upon which the trial court exercised its discretion. State v. Morgan (1992), 84 Ohio App.3d 229. See, also, State v. Franklin, 97 Ohio St.3d 1, 2002-Ohio-5304, ¶ 79 (a prisoner may be shackled in court where there is danger of violence or escape; the decision to impose such a restraint is left to the sound discretion of the trial court); Carter, supra (defendant in criminal case has right to appear at trial without shackles or other physical restraint except when the trial court, in exercise of sound discretion, determines such restraint is necessary for safe and orderly progress of trial); State v. Woodards (1966), 6 Ohio St.2d 14 (it is widely accepted that a prisoner may be shackled where there is danger of violence or escape). The trial court need not sit by powerlessly waiting for a defendant to commit a violent or disruptive act in the courtroom before being cloaked with the power to invoke extra security measures. Loux v. U.S. (C.A. 9, 1968),389 F.2d 911, 919-920.
{¶ 25} In this case, appellant demonstrated a propensity for violence and disruptive outbreaks. Where the facts and circumstances surrounding appellant illustrates a compelling need to impose exceptional security procedures, the trial court's exercise of discretion in this regard should not be disturbed unless its actions are not supported by the evidence before it. Franklin, at ¶ 82. The trial court reviewed and considered appellant's conduct both in and outside of the courtroom. The trial court, along with counsel for appellant and counsel for the state talked at great lengths about appellant's behavior and what would be the appropriate measure to take in order to restrain him. We find that the trial court did not err. Appellant's second assignment of error lacks merit and is not well-taken.
{¶ 26} In his third assignment of error, appellant argues that the trial court erred by permitting jurors to submit questions to the witnesses. The trial court permitted jurors to submit written questions for witnesses after each witness testimony. The trial court reviewed the questions, permitted counsel an opportunity to record objections to the questions, and asked those questions it found appropriate. The Ohio Supreme Court, in State v. Fisher, 99 Ohio St.3d 127, 2003-Ohio-2761, at ¶ 29, resolved a conflict among various appellate districts on the issue of the inherent prejudice of permitting jurors to submit questions:
* * * [W]e hold that the practice of allowing jurors to question witnesses is a matter committed to the discretion of the trial court. To minimize the danger of prejudice, however, trial courts that permit juror questioning should (1) require jurors to submit their questions to the court in writing, (2) ensure that jurors do not display or discuss a question with other jurors until the court reads the question to the witness, (3) provide counsel an opportunity to object to each question at sidebar or outside the presence of the jury, (4) instruct jurors that they should not draw adverse inferences from the court's refusal to allow certain questions, and (5) allow counsel to ask followup questions of the witnesses.
{¶ 27} "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. With this standard in mind, we review the matter before us.
{¶ 28} Although the trial court was acting prior to the decision in the Fisher case, it complied with the Fisher requirements by requiring the questions be submitted in writing, permitting the attorneys to object to questions at sidebar as they felt appropriate, instructing jurors not to feel badly if their question was not asked of the witness, and only then permitting the question to be asked of the witness. (Tr. 70.) In light of this, we find the trial court did not abuse its discretion in permitting the jurors to submit questions for witnesses. Appellant's third assignment of error is not well-taken.
{¶ 29} In his fourth and final assignment of error, appellant challenges the sufficiency and weight of the evidence to support his conviction of complicity to commit murder with firearm specification and tampering with evidence. Our review of the record reveals, however, that appellant's conviction is supported by sufficient evidence and is not against the manifest weight of the evidence.
{¶ 30} Sufficiency of the evidence is the legal standard applied to determine whether the case should have gone to the jury. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. In other words, sufficiency tests the adequacy of the evidence and asks whether the evidence introduced at trial is legally sufficient as a matter of law to support a verdict. Id. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, syllabus paragraph two, following Jackson v. Virginia (1979), 443 U.S. 307,99 S.Ct. 2781. The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact. Jenks, at 273. If the court determines that the evidence is insufficient as a matter of law, a judgment of acquittal must be entered for the defendant. See Thompkins, at 387.
{¶ 31} Even though supported by sufficient evidence, a conviction may still be reversed as being against the manifest weight of the evidence. Thompkins, at 387. In so doing, the court of appeals, sits as a " `'thirteenth juror' " and, after " `reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " Id. (quoting State v. Martin [1983], 20 Ohio App.3d 172, 175); see, also, Columbus v. Henry (1995), 105 Ohio App.3d 545, 547-548. Reversing a conviction as being against the manifest weight of the evidence should be reserved for only the most " `exceptional case in which the evidence weighs heavily against the conviction.' " Thompkins, at 387.
{¶ 32} In this case, appellant was found guilty of complicity to commit murder with firearm specification and tampering with evidence. On the law of murder, R.C. 2903.02 states that "[n]o person shall purposely cause the death of another * * *." On the law of tampering with evidence, R.C. 2921.12 states that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation."
{¶ 33} In this case, the testimony of the dispatch officers, occupants of the SUV, and witnesses to the incident, as well as the taped statement of Crowley, established that on the evening of May 11, 2001, appellant, as the driver, along with several other persons, cruised through the OSU campus area after leaving a local fast food restaurant. Someone allegedly spit into the SUV, onto the occupants. Everyone in the SUV became angry and wanted to go back and confront the person who allegedly assaulted them. Appellant proceeded down the street, slowed down, swerved into a space between two parked cars and approached Ryan Morbitzer as he was walking down the street. Crowley shot Morbitzer two times and appellant sped off from the scene. This act did not go unnoticed. Melissa Lilburn saw the SUV approach Morbitzer, heard two shots fired, saw the SUV speed off, and then saw Morbitzer walk into the middle of the street and fall down. Testimony of two women in the SUV revealed that appellant, in an attempt to find the person who spit into the SUV, stated " * * * that boy's dead, he's dead, he's dead." (Tr. 378.) Appellant drove the SUV from the scene, and parked it in an alley behind an apartment building.
{¶ 34} Based on all the evidence in the record, we conclude that there was sufficient evidence upon which a jury could reasonably conclude that all the elements of the offense of complicity to commit murder were present. Three factors exist to show appellant's intent: (1) appellant's statement "he's dead, he's dead, he's dead," (2) appellant proceeding slowly down the street looking for Morbitzer and upon spotting him, swerving towards Morbitzer to get closer to him, and (3) appellant speeding off after Crowley fired two shots at Morbitzer.
{¶ 35} Furthermore, there was sufficient evidence upon which the jury could reasonably conclude that all of the elements of the offense of tampering with evidence were present. After the shooting took place, appellant did not stop the SUV and exit it, nor did appellant drive the SUV to a police station. Appellant drove the SUV and parked it in an alley behind an apartment building. Accordingly, we hold that the jury did not lose its way and create such a manifest miscarriage of justice that the conviction must be reversed. Accordingly, appellant's fourth assignment of error lacks merit.
{¶ 36} For the foregoing reasons, appellant's first, second, third, and fourth assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
 Judgment affirmed.
[1] The trial court later told appellant that he would not wear the spit shield in front of the jury. (Vol. VI, Tr. 995, 997.)